**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ERNEST MCDUFFIE III,
d/b/a D & M CONTRACTING COMPANY,

                 Plaintiff,

-vs-                                       Case No. 3:12-cv-1283-J-34JRK

CITY OF JACKSONVILLE, FLORIDA,

                 Defendant.

_____

**O R D E R**

      **THIS CAUSE** is before the Court on the City of Jacksonville's Motion for Summary

Judgment and Incorporated Memorandum of Law (Doc. 74; Motion) filed on September 19,

2014.   Plaintiff Ernest McDuffie, III, d/b/a D & M Contracting Company (McDuffie),

proceeding pro se,[1] initiated this action against Defendant "City of Jacksonville, Florida,

ETC" (the City) on November 26, 2012, by filing a Complaint (Doc. 1; Complaint).  On March

23, 2013, the City filed Defendant City of Jacksonville's Motion to Dismiss or in the

Alternative Motion for a More Definite Statement (Doc. 17; Motion to Dismiss).  Then, on

April 5, 2013, McDuffie filed a Motion to Add Amended Complaint (Doc. 23; Motion to

Amend), and on April 10, 2013, McDuffie filed what the Court construed as a response to

the Motion to Dismiss, see Plaintiff Answer to Standard Interrogatories Memorandum of Law

(Doc. 25; Plaintiff's Response).  On April 23, 2013, the City responded to McDuffie's Motion

---

[1]     Because Plaintiff is proceeding pro se the Court has liberally construed his papers, giving them the benefit of the doubt at every turn.  See Koger v. Florida, 130 F. App'x 327, 332 (11th Cir. 2005) (citing Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998)), cert. denied, 546 U.S. 1151 (2006).

to Amend by filing Defendant City of Jacksonville's Response in Opposition to Plaintiff's Motion to Add Amended Complaint and 119 Party-Plaintiffs and Motion to File Response Two Days Out-of-Time (Doc. 26; Defendant's Response).  Then, on May 8, 2013, McDuffie filed an unauthorized reply to Defendant's Response.  See Plaintiff Answer to Defendant's City of Jacksonville Response in Opposition to Defdentant's [sic] Motion [sic] Add Amended Complaint and 119 Party-Plaintiffs Memorandum of Law (Doc. 28).  On June 13, 2013, the Court entered an order granting, in part, and denying, in part, McDuffie's Motion to Amend. See June 13, 2013 Order at 8 (Doc. 31; June 13, 2013 Order).   The Court granted McDuffie's Motion to Amend to the extent that the Court permitted McDuffie to file an Amended Complaint and denied McDuffie's request to seek to add 119 third-party plaintiffs. Id.[2]  In accordance with the Court's June 13, 2013 Order, on June 28, 2013, McDuffie filed the New Amended Complaint (Doc. 35; Amended Complaint), which is now the operative pleading in this action.[3]

In the Amended Complaint, McDuffie appears to allege that the City unlawfully discriminated against him and other "Black African[-]American businesses" in violation of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et. seq. (Title VI).  See generally Amended Complaint.  In the Motion, the City requests that the Court enter summary judgment in the City's favor pursuant

---

[2]     Accordingly, the Court denied the City's Motion to Dismiss as moot.  See June 13, 2013 Order.

[3]     In his deposition, McDuffie explained that he filed the Complaint against the "City of Jacksonville, Florida, ETC" "because the City of Jacksonville is a recipient of federal funds and all your independent authorities are sub-recipients." See Deposition of Ernest McDuffie, III at 26 (Doc. 63-1; McDuffie Dep.).  However, McDuffie names no other defendant besides the City in his Amended Complaint.  See New Amended Complaint at 1.

to Rule 56, Federal Rules of Civil Procedure (Rule(s)).  See Motion at 1.  McDuffie filed a memorandum in opposition to the Motion on November 14, 2014.  See Plaintiff Amended Response to Defendant's Motion for Summary Judgment (Doc. 81; Response).  Accordingly, the Motion is ripe for review.

## I.      Background[4]

McDuffie is the owner of a sole proprietorship named D & M Contracting Company, located in Jacksonville, Florida.  See Deposition of Ernest McDuffie, III at 4-5 (Doc. 63-1; McDuffie Dep.).  Although McDuffie's pleadings are not a model of clarity,[5] he appears to allege the City discriminated against him and other African-Americans on the basis of race in the administration of public construction contracts.  See generally Amended Complaint. In the portion of the Amended Complaint titled "First Cause of Action," McDuffie states that the City's "new Journeyman Law Ordinance . . . causes a new economic racial barrier to block Plaintiff's [sic] from participation in contractual opportunities by Defendant's officers or agents."  Id. at 35.  In the portion of the Amended Complaint titled "Second Cause of Action," McDuffie appears to allege that the City's use of "the provisions of Chapter 126 Part 8 of the City's Purchasing Code was a malicious harassment barrier to block Plaintiff's freedom to contractual opportunities from 2011."  Id. at 39.  McDuffie asserts: "The numerous improvement projects specifically are: SWIFT Program (Resolution 95-441-135),

---

[4]      Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties.  For the purposes of resolving the City's Motion for Summary Judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to the nonmoving party.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[5]      The Amended Complaint is a rambling forty-one (41) page document in which McDuffie mixes allegations of fact, legal argument, and lengthy quotations of arguably relevant and irrelevant legal authority.  As such, deciphering his claims presents a significant challenge.

Sixteen Apartment Units 1506 Perry Street, Morris Manor 9050 Norfolk Boulevard and Campus Towers 1850 Kings Road." Id. Given the scattershot nature of McDuffie's allegations, the Court endeavors here to set forth the relevant facts with regard to each of the topics raised in the Amended Complaint.

## A.    The Journeyman Ordinance

The Construction Trades Qualifying Board (CTQB) is an independent board of the City of Jacksonville which licenses, regulates and disciplines approximately 9,000 locally licensed construction, electrical, and apartment maintenance personnel. See Declaration of Richard A. Hickok ¶¶ 2-4. (Doc. 75-3; Hickok Decl.).[6] The CTQB is comprised of 18 members appointed by the Mayor and confirmed by the City Council. Id. ¶ 3. On June 2, 2010, the CTQB voted to recommend to the City Council that an amendment be enacted to Chapter 342 (Construction Trades Regulations), Section 342.118(c) of the Jacksonville Code of Ordinances (the Code). Id. ¶ 5; see also Minutes of June 2, 2010 CTQB Meeting at 5 (Doc. 75-3, Exhibit 1; Minutes). With regard to the proposed amendment, during this meeting, the CTQB heard testimony of workers at Mayport Naval Air Station (Mayport NAS), a venue which requires employees to hold either a journeyman or master certification of competence. Hickok Decl. ¶ 6; Minutes at 5. The Mayport workers testified that because of changes 10 years earlier regarding the "journeyman work force ratio," many journeymen at Mayport NAS mistakenly believed a license was no longer necessary, and therefore, allowed their licenses to become void or invalid. Hickok Decl. ¶ 6; Minutes at 5. As such, these journeymen could not work at Mayport NAS unless they "retook their examination."

---

[6]    Richard Hickok is the Executive Director of the CTQB.  Hickok Decl. ¶ 2.

Hickok Decl. ¶ 6; Minutes at 5.   Since many of the workers had been out of their apprenticeship program for some time, the purpose of the proposed amendment was to permit many of these workers to regain their credentials.   Hickok Decl. ¶ 6; Minutes at 5. Specifically, under the proposed amendment, the CTQB would allow reinstatement of these workers' licenses without taking an examination, upon payment of all applicable examination fees and outstanding licensing fees.   Hickok Decl. ¶ 7; see also CTQB Letter (Doc. 75-3, Exhibit 2; CTQB Letter).   The City Council passed Ordinance 2010-680 amending Code section 342.118 "to allow the [CTQB] greater latitude in waiving the examination requirement when a certificate of competency has become invalid[.]" See Plaintiff's Exhibit 3 at 29 (Doc. 35, Exhibit 3; Plaintiff's Exhibit 3);[7] see also Hickok Decl. ¶ 8.   The ordinance amended Code section 342.118(c) to read:

> Failure of the holder of the delinquent certificate of competency to renew prior to the expiration of the current licensure cycle renders the certificate of competency invalid.  The holder of the invalid certificate of competency must reapply in the same manner, including examination and all applicable fees. However, the Board may waive the examination requirements for good cause shown if an application is filed within six months after expiration of the certificate of competency.

Plaintiff's Exhibit 3 at 30;[8] see also CTQB Letter.  Hickok testified that "Ordinance 2010-680 did not create a journeyman work ratio requirement."   Hickok Decl. ¶ 9.  Rather, the "sole purpose of the amendment allowed for reinstatement of a journeyman license for individuals

_____

[7]    Plaintiff's exhibits filed with the Amended Complaint have not been scanned into the Court's CM/ECF system.  These exhibits are maintained in paper format by the Clerk of the Court.

[8]    Plaintiff's Exhibit 3 indicates that this amendment was made to Code section 342.118(b). However, the City's exhibits and the text of the current Code indicate that this amendment was made to section 342.118(c).  See CTQB Letter; Code § 342.118(c).

that had let their license lapse without having to take an exam upon payment of all

applicable fees." Id.

> **B.      The City's Procurement Code**[9]

The City's Procurement Code is contained in Chapter 126 of the Code.  Chapter 12,

Part 8 of the Procurement Code is titled "Federal Affirmative Action Compliance" and states,

in relevant part,

> It is the intent of the Council that to the extent that federal affirmative action compliance is required to be implemented by the City in conjunction with the bidding and awarding of City contracts that the City shall assure such compliance. This compliance shall include but not be limited to the provisions of Presidential Executive Order 11246, and those federal laws and regulations set forth in Section 400.103, Ordinance Code.

Code § 126.801.  Part 8 further states, "It shall be the responsibility and duty of the Mayor

to carry out the intent of the Council as expressed in Section 126.801 herein."  Code §

126.802.  Additionally, Part 1 of the City's Procurement Code contains a provision which lists

certain instances where the City need not engage in competitive solicitation.  This provision

is titled "Exemptions" and states,

> Unless ordered by the Mayor or Council or otherwise required by the Jacksonville Ordinance Code, the following supplies, contractual services, professional design services, professional services, capital improvements and/or sales transactions are exempt from competitive solicitation:
>
> (a)      Artistic services or performances;
> (b)      Lectures by individuals;
> (c)      Health services involving examination, diagnosis, treatment, prevention, medical consultation, or administration;
> (d)      Services provided to persons with mental or physical disabilities by not-for-profit corporations which have obtained exemptions under the

---

[9]      In the Amended Complaint, McDuffie refers to the Procurement Code as the "Purchasing Code."

provisions of § 501(c)(3) of the United States Internal Revenue Code (in acquiring such services, the ability of the vendor, past performance, willingness to meet time requirements and price shall be considered in an effort to obtain the highest quality services at the greatest economic value to the City).

(e)   Prevention services related to mental health, including drug abuse prevention programs, child abuse prevention programs, and shelters for runaways, operated by not-for-profit corporations (in acquiring such services, the ability of the vendor, past performance, willingness to meet time requirements and price shall be considered in an effort to obtain the highest quality services at the greatest economic value to the City).

(f)   Supplies or services or commodities provided by governmental entity or agencies.

(g)   Supplies or services to be provided by those specifically prescribed within authorizing legislation that appropriates the same.

(h)   Supples or services procured utilizing General Services Administration, State of Florida and other contracts and agreements that have been competitively procured, awarded and contracted by a federal, state, municipal, County, or local governmental entity, body politic, or using agency, provided that said procurement is not otherwise prohibited by law.

Code § 126.107.

## C.   The SWIFT Program

McDuffie operates the SWIFT ("Skills Work Innovative Force Training") Program, an affirmative action program designed after Part 8 of the City's Procurement Code to help African-Americans in Jacksonville, Florida, become journeymen and contractors.  McDuffie Dep. at 30-40; see also Plaintiff's Exhibit 6 at 1-9 (Doc. 35, Exhibit 6; Plaintiff's Exhibit 6). In 1995, the City Council passed Resolution 95-441-135, which states, "The Council hereby endorses the concept of the SWIFT program.  Said program is described in the documents entitled Composite Exhibit A attached hereto and incorporated by this reference."  See Plaintiff's Exhibit 6 at 80; see also McDuffie Dep. at 31.  According to McDuffie, the SWIFT

Program is "still trying to help blacks become apprentices and journeymens and bring in blacks as sub-subs." McDuffie Dept. at 34. Indeed, McDuffie testified that he "used" the SWIFT Program on two projects - the "Cecil Field project" and the project to build the new state courthouse. Id. at 36, 38.[10]

### D.    The Perry Street, Morris Manor, and Campus Towers Projects

The Rental Rehabilitation Loan Program (the Program) for the City's Housing and Community Development Division (HCDD) provides funding to for-profit and not for-profit investor-owners to acquire or rehabilitate substandard housing in order to expand the supply of affordable rental housing units for low and moderate-income families in Jacksonville, Florida.   Declaration of Darrell V Griffin ¶¶ 6, 7 (Doc. 75-1; Griffin Decl.);[11] see also Department of Housing and Urban Development Rental Rehabilitation Loan Program Policy & Procedures Manual (Doc. 75-1, Exhibit 1; Program Manual).  Owner-applicants seeking funding through the Program must first submit an application and provide general property information which includes commitment letters from all additional funding sources (both construction and permanent financing).   Griffin Decl. ¶ 9; see also Rental Rehabilitation Program Application (Doc. 75-1, Exhibit 2; Program Application).  Then, a HCDD Housing Rehabilitation Specialist conducts an initial inspection of the property to ensure compliance with applicable local, state, and federal building code standards and program guidelines. Griffin Decl. ¶ 10; see also Program Manual § 6.  The Housing Rehabilitation Specialist

---

[10]      Beyond testifying that from 2009-2012, "the SWIFT [P]rogram was used on the courthouse to help young blacks become pre-apprentices," see McDuffie Dep. at 38, McDuffie has not explained what he meant by saying that he "used" the SWIFT Program on these projects.

[11]      Darrell Griffin is the City's Affordable Housing Coordinator for the HCDD.  Griffin Decl. ¶ 3.

generates an itemized scope of work write-up listing all the repairs to be performed to the property.  Griffin Decl. ¶ 11; Program Manual § 7.  Notably, during the period surrounding this action, a property owner seeking funding was required to solicit at least three bids from his chosen contractors to complete the project.  Griffin Decl. ¶ 12; see also Program Manual § 9.4.  The contractor would then complete a bid package or request for proposal comprising a "complete work write-up, job spec's, drawings, cost estimate by line item and individual items (i.e.), samples of materials."  Griffin Decl. ¶ 13; see also Program Manual § 9.1.  Next, the Housing Rehabilitation Specialist would compare its scope of work write-up to the contractor's estimate to ensure that the contractor addressed all rehabilitation standards.  Griffin Decl. ¶ 14.  If the contractor's bid proposal did not include all items identified in the Housing Rehabilitation Specialist's scope of work write up, the proposal would be returned to the property owner with a request that it be revised to reflect all items included in the Housing Rehabilitation Specialist's scope of work write up.  Id. ¶ 15; see also Program Manual § 9.6.  Once all pre-approval reports, property inspections, and contractors' proposals had been submitted, the HCDD would evaluate each project.  Griffin Decl. ¶ 16.  If the project was approved and funding was available, the mortgage note and rehabilitation contract would be drafted, approved, and then executed by the Mayor.  Id. ¶ 17.  If the funding requested was greater than $100,000, the project would require approval by the City Council prior to closing.  Id. ¶ 18.

### i.    Perry Street Project

McDuffie's allegations concerning "Sixteen Apartment Units 1506 Perry Street" reference a rehabilitation project involving property owned by Kenneth and Shirley Atkins

at 1504 Perry Street, Jacksonville, Florida (the Perry Street project).  McDuffie's involvement with the Perry Street project began when he spoke with Kenneth and Shirley Atkins about his proposal for over $360,000.00 worth of rehabilitation work.   McDuffie Dep. at 51.  McDuffie and Shirley Atkins then spoke with Darrell Griffin, who manages the day-to-day operations of the Rental Rehabilitation Loan Program for the HCDD.  McDuffie Dep. at 52; Griffin Decl.¶ 5.   Griffin told them that they first would need permission from the City's Planning Department before they did anything else.  McDuffie Dep. at 52.  On December 8, 2008, McDuffie along with Kenneth and Shirley Atkins applied for a Certificate of Appropriateness from the City's Planning and Development Department.  See Application for Certificate of Appropriateness (Doc. 75-1, Exhibit 6; Application for Certificate of Appropriateness).[12]   The City's Planning and Development Department approved the application on December 17, 2008.  See id.  On December 24, 2008, McDuffie submitted to Griffin his bid proposal totaling $361,590.00 in repairs.  See Perry Street Bid Proposal (Doc. 75-1, Exhibit 6; Perry Street Bid Proposal); see also McDuffie Dep. at 53.  Then, on January 21, 2009, Kenneth and Shirley Atkins filed a Rental Rehabilitation Loan Program application requesting $361,590.00 in funding to rehabilitate their property at 1504 Perry Street.  See Perry Street Rental Rehabilitation Program Application (Doc. 75-1, Exhibit 3; Perry Street Application) see also Griffin Decl. ¶ 19.

A Housing Rehabilitation Specialist inspected McDuffie's bid proposal and determined that it did not include all line items identified in the scope of work write up.  Griffin Decl. ¶ 24;

---

[12]        McDuffie also filed a copy of the Application of Certificate of Appropriateness with his exhibits.  See Plaintiff's Exhibit 2 at 7 (Doc. 35, Exhibit 2; Plaintiff's Exhibit 2).

see also Perry Street Scope of Work Write Up (Doc. 75-2, Exhibit 7).   McDuffie's bid proposal was therefore returned to Kenneth and Shirley Atkins with requests that the bid be revised to reflect the Housing Rehabilitation Specialist's scope of work write up and that Kenneth and Shirley Atkins obtain two more bids so that the project could be competitively bid.  Griffin Decl. ¶ 24.  Notably, the Perry Street Application included a statement that "[a]ll jobs must be placed out for bid following City procedures and federal procurement guidelines."  See Perry Street Application Part E.  However, in his declaration, Griffin states that Kenneth and Shirley Atkins only requested a bid from McDuffie and did not solicit bids from any other contractor.  Griffin Decl. ¶ 22.  On June 19, 2009, Griffin informed Kenneth and Shirley Atkins that their request for funding was not granted due to a lack of funds in the Rental Rehabilitation Loan Program.  See June 19, 2009 Letter (Doc. 75-2, Exhibit 10; June 19, 2009 Letter); see also Griffin Decl. ¶ 29.  Griffin also notified Kenneth and Shirley Atkins that because his office receives funding annually, they could contact him on July 1, 2010, to see if funds were  available then.  See June 19, 2009 Letter; Griffin Decl. ¶ 29.  In August 2010, Kenneth Atkins passed away, and the application for the Perry Street project was withdrawn.  Griffin Decl. ¶ 30.

McDuffie's recollection of these events differs in non-material ways.  According to McDuffie, he and Kenneth and Shirley Atkins met with Griffin in December 2008, at which point Griffin told them "he didn't have enough money to actually do the project at the time." McDuffie Dep. at 46-47.  McDuffie further testified that after Griffin informed him and the Atkins about the lack of funding, McDuffie went to the Mayor's aide, Kerri Stewart, who told McDuffie that "the Mayor had approved the money and the City had the money to do the

project and [he] could get started." Id. at 54.  According to McDuffie, the Perry Street project was "put out" for additional bids only after he went to the Mayor's office.  Id. at 60.  However, McDuffie explained that he did not submit a bid for the project once it was put out for additional bids because he doesn't "bid against [himself]" and because he "didn't have to submit a bid" since he "already had submitted a bid" and "already had approval plans." McDuffie Dep. at 60-61.[13]

### ii.   Morris Manor and Campus Towers Projects

McDuffie's allegations concerning "Morris Manor 9050 Norfolk Boulevard and Campus Towers 1850 Kings Road" reference a rehabilitation project involving two properties owned by George Barnes (Barnes) at 9050 Norfolk Boulevard, Jacksonville, Florida (Morris Manor project), and 1850 Kings Road, Jacksonville, Florida (Campus Towers project). Barnes spoke first with Griffin about these projects before McDuffie's involvement, which began when Barnes called McDuffie about "putting a price together."  McDuffie Dep. at 62-63, 65-66, 73-74.  On April 16, 2010, Barnes filed two Rental Rehabilitation Loan Program applications - one requesting $608,077.10 in funding to rehabilitate the Morris Manor property and another requesting $303,835.00 in funding to rehabilitate the Campus Towers property.  See Morris Manor Rental Rehabilitation Application (Doc. 75-1, Exhibit 4; Morris Manor Application); Campus Towers Rental Rehabilitation Application (Doc. 75-1, Exhibit 5; Campus Towers Application); Griffin Decl. ¶ 20.  As with the Perry Street Application, the Morris Manor and Campus Towers Applications both included a statement that "[a]ll jobs

---

[13]      In light of McDuffie's testimony, there appears to be some non-material ambiguity in the record with regard to whether Kenneth and Shirley Atkins solicited additional bids for the Perry Street project beyond McDuffie's original bid and whether the project was put through the competitive bidding process.

must be placed out for bid following City procedures and federal procurement guidelines." See Morris Manor Application Part E; Campus Towers Application Part E.   However, originally, Barnes only requested bids from McDuffie.  Griffin Decl. ¶ 22.  On July 21, 2010, McDuffie submitted to Barnes his bid proposals for the Morris Manor and Campus Towers projects.  See Morris Manor Bid Proposal (Doc. 75-1, Exhibit 6; Morris Manor Bid Proposal); Campus Towers Bid Proposal (Doc. 75-1, Exhibit 6; Campus Towers Bid Proposal).  As with the Perry Street project, the Housing Rehabilitation Specialist inspected McDuffie's bid proposals and determined that they did not include all line items identified in the Housing Rehabilitation Specialist's scope of work write up.  Griffin Decl. ¶ 24; see also Morris Manor Scope of Work Write Up (Doc. 75-2, Exhibit 7)[14] and Campus Towers Scope of Work Write Up (Doc. 75-2, Exhibit 7).  McDuffie's bid proposal was therefore returned to Barnes with a request that the bid be revised to reflect the Housing Rehabilitation Specialist's scope of work write up and to obtain two more bids so that the project could be competitively bid. Griffin Decl. ¶ 24.

On March 3, 2011, Barnes supplied Griffin with the names of five additional contractors from whom Barnes requested bids.  Id. ¶ 25; see March 3, 2011 Letter (Doc. 75-2, Exhibit 8; March 3, 2011 Letter).[15]  On March 4, 2011 Barnes informed Griffin that on February 4, 2011, he had requested from McDuffie a revised bid proposal to reflect the Housing Rehabilitation Specialist's scope of work write up for the Morris Manor and Campus

---

[14]     The Morris Manor Scope of Work Write Up filed with the Court appears incomplete.

[15]     The March 3, 2011 Letter indicates that Barnes actually provided Griffin with the names of six additional contractors.  See March 3, 2011 Letter.

Towers projects, yet McDuffie did not comply with this request.  Griffin Decl. ¶¶ 26, 27; <u>see</u>

March 4, 2011 Letter (Doc. 75-2, Exhibit 9; March 4, 2011 Letter).  Barnes also informed

Griffin that McDuffie indicated he was filing a complaint "about this job" against the "Housing

and Neighborhood Department, City of Jacksonville[,] Florida."  <u>See</u> March 4, 2011 Letter;

Griffin Decl. ¶ 27.  Indeed, McDuffie never submitted a revised bid proposal for the Morris

Manor and Campus Towers projects.  Griffin Decl. ¶ 28.[16]  Barnes withdrew his application

for the Morris Manor project as other sources of funding were identified, and the Campus

Towers Project was re-bid and is currently awaiting approval by the City Council.  <u>Id.</u> ¶¶ 31-

32.

## II.    Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary

judgment may include "depositions, documents, electronically stored information, affidavits

or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[17]  An issue is

---

[16]    McDuffie testified that he declined to resubmit a bid because his "price was public information" and because he was "not going to compete against [himself]."  <u>See</u> McDuffie Dep. at 70-71.

[17]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u>  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

Of course, "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to pro se litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" Nalls v. Coleman Low Fed. Inst., 307 F. App'x 296, 298 (11th Cir. 2009) (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998)).

## III.    Discussion

In the Amended Complaint, McDuffie appears to allege two causes of action: In the first cause of action, titled "Violation of the Fourteenth Amendment and 42 U.S.C. Sec. 1983," McDuffie asserts that the City has caused him "to be denied equal protection of the Law, and to be deprived of equal privileges and immunities under the Laws[.]" Amended Complaint at 35. Specifically, McDuffie alleges that the City's "new Journeyman Law Ordinance . . . causes a new economic racial barrier to block Plaintiff's [sic] from participation in contractual opportunities by Defendant's officers or agents" and that "[i]n so doing, Defendants have caused Plaintiff to suffer deprivation of his fundamental right to

practice his occupation solely on account of race." Id.  In the second cause of action, McDuffie appears to allege a violation of Title VI. Id. at 36.  Specifically, McDuffie alleges that the City's failure to use "the provisions of Chapter 126 Part 8 of the City's Purchasing Code was a malicious harassment barrier to block Plaintiff's freedom from contractual opportunities from 2011." Id. at 39.  McDuffie then alleges: "The numerous improvement projects specifically are: SWIFT Program (Resolution 95-441-135), Sixteen Apartment Units 1506 Perry Street, Morris Manor 9050 Norfolk Boulevard and Campus Towers 1850 Kings Road." Id.

In the Motion, the City addresses McDuffie's allegations under Title VI only.  See generally Motion.  However, it appears that in his first cause of action, McDuffie asserts a claim under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution.[18] "[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983.  To prevail on

─────────────────────

[18]     The Fourteenth Amendment's Privileges and Immunities Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. Amend. XIV, § 1.  The Privileges and Immunities Clause "protects all citizens against abridgement by states of rights of national citizenship as distinct from the fundamental or natural rights inherent in state citizenship." Madden v. Ky., 309 U.S. 83, 90-91 (1940).  "The rights and privileges of [n]ational citizenship include the right to petition Congress, to vote for [n]ational officers, to enter public lands, to be protected against violence while in the custody of a United States Marshal, and to inform the United States authorities of violations of its laws." Murphy v. Mount Carmel High School, 543 F.2d 1189, 1192 n.2 (7th Cir. 1976) (quoting Twining v. New Jersey, 211 U.S. 78, 97 (1908)).  Here, McDuffie's allegations do not relate to any aspect of his rights and privileges of national citizenship.  As such, McDuffie has failed to allege, let alone put forth evidence, that the City has deprived him of any federal privileges and immunities protected by the Fourteenth Amendment.  Therefore, the Court will decline to address any claim McDuffie may have with regard to the Privileges and Immunities Clause.

such a claim, a § 1983 plaintiff is required to establish that the defendant, acting under color of state law, deprived him of a constitutional right.  Soldal v. Cook Cnty.,Ill., 506 U.S. 56, 60 n.6 (1992).  The Equal Protection Clause of the Fourteenth Amendment provides, in pertinent part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  This clause "is essentially a direction that all persons similarly situated should be treated alike." Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 825 F.2d 367, 369 (11th Cir. 1987); see also Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (explaining that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents" (internal quotation marks omitted)); Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006).  "To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate."  Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993). "Discriminatory intent may be established by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision."  Id.

McDuffie brings his second cause action under Title VI.  Section 601 of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d.  Section 602 in turn, "authorizes federal agencies to effectuate the provisions in § 601 by enacting regulations."  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 177 (2005).  Thus, the Eleventh Circuit has recognized that "Title VI itself provides no more protection than the [e]qual [p]rotection [c]lause - both provisions bar only intentional discrimination," Elston, 997 F.2d at 1405 n.11, but "the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory."  Id. at 1406.  In Alexander v. Sandoval, 532 U.S. 275 (2001), the United States Supreme Court recognized three basic aspects of Title VI.  "First, private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages."  Sandoval, 532 U.S. at 279.  "Second, . . . § 601 prohibits only intentional discrimination."  Id. at 280.  Third, "for purposes of deciding [the case before it] that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601."  Id. at 281.  In doing so, however, the Court unequivocally held that no "freestanding private right of action to enforce regulations promulgated under § 602" exists. Id. at 293.  Thus, the Court concluded that Title VI provides no private right of action for disparate impact discrimination under Title VI.  See id.; see also Jackson, 544 U.S. at 178 (observing that "Sandoval held that private parties may not invoke Title VI regulations to obtain redress for disparate[ ]impact discrimination because Title VI itself prohibits only intentional discrimination").

Although McDuffie does not expressly state whether he is proceeding under a disparate impact or disparate treatment theory, many allegations in the Amended Complaint indicate McDuffie's belief that the City's actions have had a disparate impact on African-Americans.  For example, McDuffie alleges that "from 1968 through 2012 [the City] has never complied with Title VI of the Civil Rights Act of 1964" and that the City's "actions have had an economically disproportionate effect on Black African[-]Americans in the City of Jacksonville, Florida."  Amended Complaint at 25.  Additionally, McDuffie generally states that the City "from 1992 through 2012 has never complied with Part 8 of Chapter 126 of the City Purchasing Code" and that "[t]he City has had an economically disproportionate effect on Black African[-]American Businesses the opportunity for training young Black African[-]American future artisan today to be producers tomorrow." Id. at 28.  McDuffie also alleges that the City's "enactment of a new Journeyman Law . . . causes a new economic racial barrier, which blocked the Plaintiff and other Black African-Americans from participation in contractual opportunities." Id. at 34.  McDuffie, as a private plaintiff, may not obtain redress for disparate impact discrimination under either the Equal Protection Clause or Title VI.  Thus, having found that McDuffie's claims alleging disparate impact are not cognizable under the law, the Court next analyzes McDuffie's remaining allegations under the disparate treatment framework of the Equal Protection Clause and Title VI.

### A.    First  Cause of Action: The Journeyman Ordinance

McDuffie's allegations that the City's Journeyman Ordinance "causes a new economic racial barrier" appear to sound largely in disparate impact.  See Amended Complaint at 34, 35.  Indeed, when asked at his deposition "how amending the Journeyman

Ordinance in 2010 discriminated against [him] or [his] business in any way[,]" McDuffie

answered that

> [b]y amending the Journeyman Ordinance in 2010 meant that to perform work in Duval County, you need to have a journeyman.  What happened in 2000, the State of Florida said that it wasn't mandatory to have a journeyman in the State of Florida.
>
> Jacksonville in 2010 put an ordinance in place 10 years later saying that you need to have a journeyman, which means that they can come on the job, any job that's dealing with the black contractors, and say, Where's your journeyman.  If you don't have a journeyman, they can say, Close the job down until you get a journeyman.
>
> Most blacks in Duval County haven't had the opportunity to go through the apprenticeship programs to become a journeyman.  It takes from four to five years to become a journeyman.  Then you have to pass the journeyman test. . . .
>
> Black companies could not grow because we don't have journeymens (sic).

McDuffie Dep. at 12-14.  Even assuming McDuffie's allegations constitute a claim of

intentional discrimination with respect to the City's amended Journeyman Ordinance, this

claim still fails.  McDuffie's own evidence shows that the City Council enacted Ordinance

2010-680 amending Code section 342.118Pla "to allow the [CTQB] greater latitude in

waiving the examination requirement when a certificate of competency has become

invalid[.]"  See Plaintiff's Exhibit 3 at 29.  This text of the amended ordinance, see supra at

5, does not support any inference of intentional discrimination by the City.  Indeed, the

language of this ordinance does not even support McDuffie's interpretation that the 2010

amendment changed the requirements for the use of journeymen on construction sites.

McDuffie has put forth no evidence that the passage of this amendment has harmed him

and no evidence that its passage was in any way racially motivated.[19]   As such because McDuffie has failed to raise any genuine issues of material fact with regard to his claim involving the Journeyman Ordinance, his first cause of action is due to be dismissed.

**B.     Second Cause of Action: The City's Procurement Code, SWIFT Program, Perry Street Project, Morris Manor Project, and Campus Towers Project**

In his second cause of action, McDuffie appears to allege a violation of Title VI based on the City "waiv[ing] the provisions" of the City's Procurement Code which require federal affirmative action compliance.  Amended Complaint at 27.  McDuffie alleges that the City's failure to use "the provisions of Chapter 126 Part 8 of the City's Purchasing Code was a malicious harassment barrier to block Plaintiff's freedom to contractual opportunities from 2011."  Id. at 39.  Specifically, McDuffie appears to allege that the City's actions prevented him from using the SWIFT Program with the Perry Street project, Morris Manor project, and Campus Towers project.  Id.

The City's Procurement Code contains a provision requiring compliance with federal affirmative action laws and regulations.  See Code § 126.801.  The Procurement Code also contains a provision exempting from competitive solicitation certain "supplies, contractual services, professional design services, professional services, capital improvements and/or sales transactions[.]"  See Code § 126.107.  In the Motion, the City contends that because Code section 126.107 permits the City to exempt certain projects from competitive solicitation, "what plaintiff is calling 'waiving' the purchasing code is no more than complying with the purchasing code."  Motion at 11 (emphasis in original).  While the City's gloss on

---

[19]      In fact, McDuffie testified that he is currently a licensed carpenter journeyman.  McDuffie Dep. at 17-18.

McDuffie's argument may be accurate, the Court declines to recharacterize McDuffie's claims in the manner suggested. Nonetheless, because the City has discharged its burden of demonstrating there are no genuine issues of material fact, and McDuffie has offered no evidence that the City denied McDuffie participation in any program or activity receiving federal financial assistance on the basis of race, color, or national origin, McDuffie's Title VI claim fails as a matter of law.

With regard to the SWIFT Program, McDuffie testified that

the City of Jacksonville is not compliant with Part 8 of the Purchasing Code, wherein the SWIFT [P]rogram is basically designed to work with Part 8 of the Purchasing Code dealing with affirmative action. Because the City do not comply with affirmative action, have never complied with affirmative action, then I can't use the SWIFT [P]rogram on City contracts because they don't comply with the affirmative action.

McDuffie Dep. at 37. McDuffie appears to allege that the City's failure to comply with Part 8 of the City's Procurement Code has prevented him from using the SWIFT Program to obtain contractual opportunities,[20] specifically the Perry Street project, Morris Manor project, and Campus Towers project, in violation of Title VI.[21] Although the evidence indicates that

---

[20]      Notably, McDuffie testified that he was able to "use" the SWIFT Program on two projects: the "Cecil Field project" and the new county courthouse project. Id. at 36, 38.

[21]      In the Response, McDuffie points to at least eight additional projects with regard to which he alleges the City discriminated against by failing to use federal affirmative action law. See Response at 7-8; 20-21. The Court observes that McDuffie cannot interject these new claims in his Response to the Motion. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1313 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot.") (footnote omitted). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule] 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." Id. at 1315 (citation omitted). Therefore, the Court will limit its analysis to the Perry Street, Morris Manor, and Campus Towers projects.

McDuffie was ultimately not awarded the contracts for these projects, there is no evidence that McDuffie was denied these projects on the basis of his race, color, or national origin.

McDuffie submitted an initial bid proposal in conjunction with Kenneth and Shirley Atkins' Rental Rehabilitation Loan Program application to receive funding from the City for the Perry Street project. See Perry Street Bid Proposal. However, the City declined to fund the Perry Street project for what appear to be at least two independent reasons, neither of which have anything to do with McDuffie. First, Griffin informed Kenneth and Shirley Atkins that the Rental Rehabilitation Loan Program lacked funding for the project. See June 19, 2009 Letter. Second, in August 2010, Kenneth Atkins passed away, and the funding application was withdrawn. Griffin Decl. ¶ 30. Further, the record also indicates that the HCDD's Housing Rehabilitation Specialist requested that McDuffie's bid proposal be revised to reflect the Housing Rehabilitation Specialist's scope of work write up. Griffin Decl. ¶ 24. There is no indication that McDuffie ever submitted a revised bid proposal. Instead, McDuffie testified that once the Perry Street project was put out for additional bids, he declined to submit an additional bid. McDuffie Dep. at 60-61.

With regard to the Morris Manor and Campus Towers projects, McDuffie submitted his bid proposals for these two projects to the Rental Rehabilitation Loan Program on July 21, 2010. See Morris Manor Bid Proposal; Campus Towers Bid Proposal. However, as with the Perry Street project, the HCDD's Housing Rehabilitation Specialist requested that McDuffie's bid proposals for these projects be revised to reflect the Housing Rehabilitation Specialist's scope of work write up. Griffin Decl. ¶ 24. Moreover, as with the Perry Street project, McDuffie refused to submit revised bid proposals for the Morris Manor and Campus

-24-

Towers projects.  Id. ¶ 28; March 4, 2011 Letter.  Barnes withdrew his application for the Morris Manor project when other sources of funding were identified, and the Campus Towers project was re-bid and is currently awaiting approval by the City Council.  Griffin Decl. ¶¶ 31-32.  In response to the City's evidence regarding the race neutral reasons for these decisions, McDuffie points to no evidence that would even suggest that the City declined to award McDuffie these contracts on the basis of race, color, or national origin.

Because McDuffie has failed to raise any genuine issues of material fact with regard to his claims involving the City's Procurement Code, the SWIFT Program, the Perry Street project, the Morris Manor project, and the Campus Towers project, his second cause of action fails on the merits.

Accordingly, it is hereby

**ORDERED**:

1. City of Jacksonville's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 74) is **GRANTED**.

2. The Clerk of Court is directed to enter **JUDGMENT** in favor of Defendant City of Jacksonville, Florida, and against Plaintiff Ernest McDuffie, III, d/b/a D & M Contracting Company.

3.     The Clerk of Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 25th day of February, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc18

Copies to:

Counsel of Record

Unrepresented Parties

-26-